# In the United States Court of Federal Claims

No. 20-1043C
Filed Under Seal: December 18, 2020
Reissued: January 8, 2021[1]

|   |
|---|
| **PEOPLE, TECHNOLOGY & PROCESSES, LLC,**<br><br>                *Plaintiff*,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>                *Defendant.* |

*Craig A. Holman*, Lead Attorney, Arnold & Porter Kaye Scholer LLP, Washington, DC, with whom were *Kara L. Daniels*, Of Counsel, and *Nathaniel E. Castellano*, Of Counsel, Arnold & Porter Kaye Scholer LLP, Washington, DC, for Plaintiff.

*Sosun Bae*, Senior Trial Counsel, *Patricia M. McCarthy*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, and *Jeffrey Bossert Clark*, Acting Assistant Attorney General, U.S. Department of Justice, with whom were *Isabelle P. Cutting*, Of Counsel, U.S. Air Force, and *Maj. Michelle E. Gregory*, Of Counsel, U.S. Air Force, for Defendant.

**OPINION AND ORDER ON CROSS-MOTIONS
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**TAPP, Judge.**

      Before the Court in this post-award bid protest are the parties' cross-motions for judgment on the administrative record. (Pl.'s Mot. for J. on Admin. R., ECF No. 18; Pl.'s Mem. of Law In Supp. of Mot. for J. on Admin. R., ECF No. 18-1 ("Pl.'s Mem."). Def.'s Cross-Mot. for J. on Admin. R., ECF No. 19 ("Def.'s Cross-Mot.")). On August 19, 2020, Plaintiff, People, Technology and Processes, LLC ("PTP"), filed a four-count complaint challenging the evaluation and award decision of U.S. Special Operations Command ("USSOCOM" or the "Agency"), concerning a multiple award Indefinite Delivery, Indefinite Quantity ("IDIQ") procurement for Special Operations Forces ("SOF") Core Services Support ("SCS"), under Solicitation No. H92400-19-R-0003 ("Solicitation" or "RFP"). (Compl., ECF No. 1; Redacted

---

[1] This Opinion and Order was originally filed under seal on December 18, 2020. ECF No. 27. The parties were given an opportunity to submit proposed redactions, which were filed by Defendant as "Agreed-Upon" redactions on January 4, 2021. ECF No. 29. The Court hereby adopts those redactions and reissues its Opinion and Order. The agreed-upon redactions are indicated by three consecutive asterisks within brackets ([* * *]).

Compl., ECF No. 15). Specifically, PTP challenges the Agency's determination that PTP's proposal did not satisfy the Capabilities sub-element of the Factor 1 (Technical) IDIQ Management criteria, delineated in section M2.2.1 of the Solicitation, as arbitrary, capricious, and contrary to law. (*See generally*, Compl.).

Also before the Court is PTP's November 18, 2020, Motion to Strike Exhibit A to Defendant's Reply brief and portions of the reply brief related to Exhibit A, which relates to a declaration of the Agency's Contracting Officer. (Pl.'s Mot. to Strike, ECF No. 22; Def.'s Reply, Ex. A, ECF No. 21). These matters are now fully briefed and ripe for decision.

For the reasons set forth below, the Court **DENIES** PTP's Motion for Judgment on the Administrative Record and request for a permanent injunction, and **GRANTS** the United States' Cross-Motion for Judgment on the Administrative Record. In addition, the Court **DENIES-AS-MOOT** PTP's Motion to Strike. The Court will address each issue in turn.

## I. Background

PTP is a Service Disabled Veteran Owned Small Business that provides information technology services, software solutions, and professional development training. (Compl. at 6). A majority of PTP's employees, including senior leadership, are former Special Operations Forces service members. (*Id.*). PTP and its partners have successfully performed several prior contracts in support of USSOCOM and other federal agencies. (*Id.* at 1, 6).

On June 14, 2019, USSOCOM issued a Solicitation for a Special Operations Forces Core Support Services multiple award IDIQ contract, pursuant to Federal Acquisition Regulation (FAR) Part 15, Defense FAR Supplement (DFARS) Part 215, and Section 825 of the National Defense Authorization Act (NDAA) for Fiscal Year 2017 Class Deviation 2018-O0006. (AR 342, 564).[2] The Solicitation's Statement of Work (SOW) stated that USSOCOM was seeking support in six areas: Education and Training Services; Management Support Services; Program Management; Engineering and Technical Services; Professional Services; and Administrative and Other Services. (AR 522, 522–25).

Offerors were directed to submit proposals in three separate volumes, each of which were evaluated independently from the other volumes. (*See* AR 557, 558). The Solicitation provided that Volume I, Administrative and Responsibility Material, would be evaluated on a "pass/fail" basis; Volume II, IDIQ Management, would be evaluated on an acceptable/unacceptable basis; and Volume III, Past Performance, would be assigned a confidence level rating. (AR 564). The Solicitation stated that awards would be made to all offerors that received a "pass" rating for the Administrative and Responsibility criteria (Vol. I), an "acceptable" rating for Factor 1 – IDIQ Management (Vol. II), and a "substantial confidence" rating for Past Performance (Vol. III). (AR 564, 567).

Importantly, the Solicitation set forth several formatting requirements for the proposals. (*See* AR 556–57). For example, section L1.9, covering cross-referencing, provided that

---

[2] The Agency issued an amended solicitation on August 1, 2019, which did not change any provisions relevant to this protest. (*See* AR 342, 477, 482).

"[v]olumes shall not include glossaries, compliance matrices or acronym lists." (AR 556–57). Instead, offerors were directed to "submit, as a standalone document marked 'Cross-Reference', a comprehensive glossary, compliance matrix and acronym list." (AR 558). The provision explained that "[t]his 'Cross Reference' Document shall not be included in any volume and has no page limit." (*Id.*). Further, "[e]ach volume shall be written on a stand-alone basis so that its contents may be evaluated with a minimum of cross referencing to other volumes in the proposal. Information required for proposal evaluation which is not found in its designated volume will be assumed to have been omitted." (AR 558).

In addition, the Solicitation contained a "General Information" section, which explained that "[t]he proposal must include all data and information requested and must be submitted in accordance with [] these instructions. . . . Proposals must be complete, self-sufficient, and respond directly to the requirements of the solicitation." (AR 556). The Solicitation further provided "**Do not merely reiterate the SOW or reformulate the requirements specified in the solicitation.**" (*Id.*) (emphasis in original). Finally, the Solicitation stated: "**At a minimum, each Volume shall be submitted as a separate file.**" (AR 557) (emphasis in original).

With respect to Volume II, Factor 1 IDIQ Management, the Solicitation provided general instructions which stated "Volume II must provide specifics and be complete. All requirements specified in the solicitation are mandatory." (AR 559). This portion of the Solicitation instructed offerors to provide a summation of their team's capabilities to meet three stated imperatives: stability, agility, and reach. (*See* AR 559–60). Specifically, the Solicitation stated:

> **L3.2.1.1 Capabilities.** Summarize the capabilities of your team to meet the requirements of the SOW that results in your team's stability, agility, and reach in accomplishing the overall mission. Include a summary of your team's experience in providing services of a similar scope. Stability is informed by the team's capability to sustain a technical workforce with requisite expertise in a dynamic environment. Agility is informed by the team's aggregate ability to address all mission areas. Reach is informed by the team's organizational capability and processes to effectively execute all requirements.

(AR 560).

With respect to the evaluation of Volume II, the Solicitation explained that "[e]valuation of proposals will focus on the offeror's ability and approach to meet and understand the SCS SOW requirements. Note that if an offeror's proposal does not meet a Government requirement, it will result in an Unacceptable proposal." (AR 565). For the Program Management portion of Volume II, "[t]he Government will evaluate the extent to which the offeror's overall Program Management Plan demonstrates a sound, practical methodology for satisfying the requirements stated in the solicitation. The assessment will focus on the offeror's ability to ensure all resources are available to successfully execute SCS requirements." (*Id.*). With regard to the Capabilities portion of Volume II, section M2.2.1.1, the Solicitation provided:

> **M2.2.1.1 Capabilities.** The Government will evaluate breadth and depth of the capabilities of the offeror (including teaming partners and subcontractors)

3

> in providing support of similar scope and size, to similar organizations. The Government will evaluate the breadth and depth of the offeror's stability, agility, and reach in accomplishing the overall mission. Offerors that can describe the degree to which their team covers ALL required skill-levels, capabilities, and experience as required by the applicable SOW, will be viewed as capable of providing stability and agility. An offeror with redundancy within its team, in a manner that encourages healthy internal competition, will demonstrate agility and reach. A team construct that ensures equitable workshare will demonstrate stability. Descriptions of experience which include empirical summaries of results in transition, staffing, and issue resolution, as well as organizations that are disposed in multiple (global) locations, demonstrate all three Imperatives.

(AR 565).

Ultimately, USSOCOM received [* * *] timely offers, including an offer from PTP. (AR 10684). On September 3, 2019, the Source Selection Evaluation Board ("SSEB") convened for training as to how the proposals should be evaluated. (*See* AR 4017–84). The training materials noted that "Source Selection is a Subjective Process; Government MUST do what we state we will do in [the "Evaluation Process"] Section M." (AR 4084) (emphasis in original). In addition, the training explained that "SSEB evaluates proposals against evaluation criteria NOT proposals against one another; [the Source Selection Advisory Council ("SSAC")] (or [Source Selection Authority ("SSA")]) conducts the comparative analysis." (AR 4083) (emphasis in original).

The SSEB conducted an initial evaluation of the timely proposals from September 3, 2019, to March 6, 2020, (AR 8837), and issued a final evaluation report to the SSAC on March 21, 2020. (*See* AR 8834–9026). In the final evaluation report, the SSEB assigned PTP a [* * *] rating for the Administrative and Responsibility materials (Vol. I), an "Unacceptable" rating for the Factor 1 IDIQ Management criteria (Vol. II), and a [* * *] rating for its past performance proposal (Vol. III). (AR 8956–8964). The SSEB explained the unacceptable rating for the Factor 1 IDIQ Management portion of PTP's proposal (Vol. II) as follows:

> 2.2.1    Element 1 – Program Management
>
> [* * *]
>
> 2.2.1.1.    Sub-Element 1.1 – Capabilities
>
> [* * *]

(AR 8956–57). PTP received [* * *] ratings for all other sub-elements of the IDIQ Management portion of its proposal. (*See id.*).

After reviewing the SSEB final evaluation report, the SSAC analyzed the proposals and, on April 3, 2020, made a recommendation for award to the Source Selection Authority. (AR 9028, 9103). Thereafter, the Source Selection Authority conducted an independent review, following "the evaluation process described in Section M of the RFP [and] rel[ying] upon the SSEB's evaluation findings and the SSAC's recommendation report." (AR 9103–04). The

Source Selection Authority ultimately made 46 awards—one to each offeror that satisfied all qualifying criteria for each of the three volumes. (AR 9107). PTP was not selected for an award. (*See* AR 9107–09).

USSOCOM issued a pre-award notice of successful offerors on April 23, 2020, and award notices on May 1, 2020. (AR 9158–60 (Pre-Award Notice), 9178–9954 (Award Notices)). In addition, USSOCOM issued PTP a notification that it was not receiving an award on May 1, 2020, which included a written debriefing and PTP's individual evaluation report. (AR 9974–94). PTP then submitted follow-up questions within two days of receiving the notification and written debriefing. (*See* AR 10024–30). On May 7, 2020, USSOCOM responded to PTP's debriefing questions. (*See* AR 10035–44). Of relevance here, in response to PTP's question [* * *] (AR 10038).

On May 11, 2020, PTP filed a timely post-award protest with the Government Accountability Office (GAO), challenging USSOCOM's decision to rate as unacceptable the Factor 1 IDIQ Management portion of PTP's proposal (Vol. II). (*See* AR 10345–10568; Pl.'s Mem. at 12). Specifically, PTP alleged that USSOCOM's stated rationale "misstates PTP's proposal and establishes that the evaluators failed to evaluate PTP's proposal as required by the Solicitation and the law." (AR 10346–47). PTP further argued that "the Agency evaluators misreported the contents of the tables themselves and ignored the narrative information in PTP's Proposal Volume II . . . ." (AR 10347). In addition, PTP alleged that the evaluation of the technical portion of its proposal (Vol. II) was inconsistent with the evaluation of the past performance portion of its proposal, and that USSOCOM conducted an unequal evaluation of PTP's proposal compared to several awardees, such as [* * *] (AR 10347–48). In response to PTP's GAO protest, USSOCOM's contracting officer filed a "Consolidated Contracting Officer's Statement of Facts and Memorandum of Law." (*See* AR 10680–10705).

On July 24, 2020, the parties convened for an Alternative Dispute Resolution (ADR) conference. (*See* AR 11697). After hearing the parties' respective positions, the GAO ADR representative explained that he would recommend the GAO deny PTP's protest. (*Id.*). "[W]ith respect to PTP's direct challenge to the technical evaluation, [the ADR representative] found the evaluation reasonable and disagreed with PTP's evaluation of the Solicitation." (*Id.*). The ADR representative "acknowledged that there are instances where the awardee proposals include the same content that the Agency Report claimed to have found problematic in PTP's proposal," but "concluded that, when read as a whole, the different evaluation outcomes were the result of differences in the underlying proposals." (*Id.*). Finally, the ADR representative "concluded that the technical and past performance evaluations were independent" and therefore, "any discrepancy between the Agency findings with respect to past performance and the Agency's capabilities evaluation was not a basis to sustain the protest." (*Id.*).

Following the ADR recommendation to deny PTP's protest, PTP withdrew its GAO protest on July 31, 2020. (*See* AR 11698). On August 19, 2020, PTP filed its protest in this Court. (*See* ECF No. 1).

**II.     Discussion**

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In bid protest cases, this Court reviews agency actions under the Administrative Procedure Act's "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A), (D). Under this standard, an "award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

When a challenge is brought on the first ground, the test is whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Id*. at 1332–33 (internal citations omitted). In this regard, "courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* at 1332. "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. In addition, when reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "The [C]ourt should not substitute its judgment for that of a procuring agency." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). And so, "[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applics. Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (citation omitted).

The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). Stated differently, "[the Court] will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). However, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In its Complaint, PTP alleges: (1) the Agency admits the contemporaneous rationale for rating PTP technical[ly] unacceptable is flawed, requiring remand; (2) the Agency determination that PTP is unacceptable under the capabilities sub-element is arbitrary, capricious, and contrary to law; (3) the Agency conducted an unequal capabilities sub-element evaluation to PTP's competitive prejudice; and (4) the Agency's best value determination is arbitrary, capricious, and

contrary to law. (Compl. at 24–43). Based on these alleged errors, PTP requests that the Court declare the Agency's evaluation of PTP arbitrary, capricious, or otherwise contrary to law; remand the matter back to the Agency for further consideration of PTP's proposal; and enjoin the Agency from initiating performance of any contract awarded under this Solicitation. (Compl. at 26–27, 34–35, 41–43).

The United States, on the other hand, argues that "PTP has failed to demonstrate that [USSOCOM] acted arbitrarily and capriciously when it rated PTP's Factor 1 (Technical) [IDIQ] Management Proposal . . . as unacceptable, or that the United States is impermissibly relying on *post hoc* rationalizations to explain USSOCOM's actions." (Def.'s Cross-Mot. at 1). The United States further contends that "PTP cannot establish that USSOCOM subjected it to unequal, or disparate, treatment . . . ." (*Id.*). Accordingly, the United States argues that PTP is not entitled to injunctive relief. (*Id.* at 29–31).

As explained below, the Court agrees with the United States that PTP has failed to demonstrate that the Agency's decisions were arbitrary, capricious, or otherwise not in accordance with law. Thus, the Court denies PTP's Motion for Judgment on the Administrative Record and grants the United States' Cross-Motion for Judgment on the Administrative Record. Because this protest principally challenges USSOCOM's contemporaneous evaluation of PTP's proposal, the Court will address that issue before turning to PTP's other challenges.

A. *The Agency's Contemporaneous Evaluation Of PTP's Proposal Was Not Arbitrary, Capricious, Or Otherwise Not In Accordance With The Law*

PTP's principal challenge in this protest alleges that USSOCOM's rating of "Unacceptable" for the Factor 1 (Technical) IDIQ Management, Capabilities element of PTP's proposal was arbitrary, capricious, or otherwise contrary to law. (*See generally* Compl.; Pl.'s Mem. at 17–26). According to PTP, "the SSEB's written evaluation misreported the contents of the PTP proposal tables to the SSA and shows the Agency ignored the narrative information demonstrating Team PTP's capabilities." (Compl. at 29; Pl.'s Mem. at 18, 23–26; Pl.'s Reply at 13–15, ECF No. 20). PTP argues that USSOCOM deviated from the terms of the solicitation by "apparently evaluat[ing] PTP's proposal as though a narrative explanation for every one of the SOW representative tasks was a precondition to satisfying the Capabilities sub-element," (Pl.'s Mem. at 20), and exhaustively explains why it believes its proposal satisfied the Capabilities element.[3] (Compl. at 29; Pl.'s Mem. at 9–10, 17–26). Additionally, PTP argues that the Agency's evaluation of the Capabilities portion of PTP's proposal is inconsistent with the Past Performance evaluation. (Pl.'s Mem. at 26–27). These arguments fail to show that USSOCOM's contemporaneous evaluation of PTP's proposal was arbitrary, capricious, or otherwise not in accordance with law.

---

[3] PTP interweaves other arguments throughout this discussion, namely that the Agency evaluated PTP's proposal differently than other offerees and that the Agency allegedly admitted that its contemporaneous evaluation of PTP was flawed based on statements made during debriefing and before the GAO. (*See* Compl. at 27–35). However, because these challenges go beyond the Agency's contemporaneous evaluation of PTP and are addressed separately in the parties' briefs, the Court addresses those challenges later in this Opinion.

The Solicitation explained that for the Program Management portion of Volume II, which encompassed the Capabilities element, "[t]he Government will evaluate the extent to which the offeror's overall Program Management Plan demonstrates a sound, practical methodology for satisfying the requirements stated in the solicitation. The assessment will focus on the offeror's ability to ensure all resources are available to successfully execute SCS requirements." (AR 565). With regard to the Capabilities element, the Solicitation explained:

> **M2.2.1.1 Capabilities.** The Government will evaluate breadth and depth of the capabilities of the offeror (including teaming partners and subcontractors) in providing support of similar scope and size, to similar organizations. The Government will evaluate the breadth and depth of the offeror's stability, agility, and reach in accomplishing the overall mission. Offerors that can describe the degree to which their team covers ALL required skill-levels, capabilities, and experience as required by the applicable SOW, will be viewed as capable of providing stability and agility. An offeror with redundancy within its team, in a manner that encourages healthy internal competition, will demonstrate agility and reach. A team construct that ensures equitable workshare will demonstrate stability. Descriptions of experience which include empirical summaries of results in transition, staffing, and issue resolution, as well as organizations that are disposed in multiple (global) locations, demonstrate all three Imperatives.

(AR 565).

After reviewing PTP's proposal, the SSEB rated the Factor 1 IDIQ Management portion of PTP's proposal (Vol. II) as "unacceptable" for the following reasons:

2.2.1   Element 1 – Program Management

[* * *]

2.2.1.1.   Sub-Element 1.1 – Capabilities

[* * *]

(AR 8956–57). This evaluation does not misstate the contents of PTP's proposal or deviate from the terms of the Solicitation.

The Capabilities portion of PTP's proposal contains approximately [* * *] of narrative discussion, followed by [* * *] of tables. (*See* AR 2381–89). The Solicitation's evaluation criteria explained that the Agency was evaluating the breadth and depth of the offeror's "capabilities in providing support of similar scope and size, to similar organizations." (AR 565). The SSEB concluded that PTP's proposal [* * *] (AR 8956–57). The SSEB's explanation in this regard is coherent and reasonable, and does not misrepresent PTP's proposal. *See Impresa*, 238 F.3d at 1332–33. As the Agency correctly observed, most of the Capabilities portion of PTP's proposal [* * *] (*See* AR 8956–57). Thus, the Court can reasonably discern the Agency's path in rating the Capabilities portion of PTP's proposal as unacceptable. *See Bowman Transp.*, 419 U.S. at 286; *see also Honeywell*, 870 F.2d at 648.

In its next attack, PTP extrapolates from the SSEB's statement that [* * *] to argue that "the Agency ignored the narrative information demonstrating Team PTP's capabilities," or "evaluated PTP's proposal as though a narrative explanation for every one of the SOW representative tasks was a precondition to satisfying the Capabilities sub-element." (Pl.'s Mem. at 18, 19–26; Compl. at 29). PTP quotes numerous statements, including post-award statements of the CO, scattered throughout Volume II of its proposal, to argue that it did provide information as to the breadth and depth of its capabilities. (*See* Pl.'s Mem. at 18–26). Nothing in the agency report, however, supports PTP's allegation that the Agency ignored the narrative portion of PTP's proposal or evaluated the proposal as requiring a narrative explanation for every task listed in the SOW. (*See* AR 8956–64). "Such naked claims, no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." *Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). Moreover, so long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell*, 870 F.2d at 648.

Finally, PTP alleges that the Agency's evaluation of PTP's Capabilities is inconsistent with its evaluation of PTP's Past Performance. (Pl.'s Mem. at 26–27; Pl.'s Reply at 15–17). This allegation is without merit. The Capabilities portion of the proposal was to be provided in Volume II of an offeror's submission, while the Past Performance portion was to be included in Volume III. (*See* AR 557, 558). The Solicitation's directives were unambiguous: "**At a minimum, each Volume shall be submitted as a separate file.**" (AR 557) (emphasis in original). Further, "[e]ach volume shall be written on a stand-alone basis so that its contents may be evaluated with a minimum of cross referencing to other volumes in the proposal. Information required for proposal evaluation which is not found in its designated volume will be assumed to have been omitted." (AR 558). As PTP acknowledges, "where . . . an agency deviates from the terms of the solicitation, the evaluation is contrary to law." (Pl.'s Mem. at 18 (citing *OTI Am., Inc. v. United States*, 68 Fed. Cl. 646, 654–55 (2005)). Yet, PTP's argument, if accepted, would deviate from the terms of the solicitation by requiring the Agency to cross-reference separate volumes to consider information that is not found in its designated file. (*See* AR 557, 558). The Court will not entertain such an invitation.[4]

In short, the Court is able to reasonably discern the Agency's path in rating the Capabilities portion of PTP's proposal as unacceptable. *See Bowman Transp.*, 419 U.S. at 286. The SSEB accurately stated that the majority of the Capabilities section of PTP's proposal is [* * *] (AR 8956–57). And nothing in the agency report supports PTP's allegation that the Agency ignored portions of its proposal or required a narrative explanation for every task listed in the SOW. Finally, PTP's argument that the Agency's evaluation was internally inconsistent would require the Agency to deviate from the terms of the Solicitation by cross-referencing separate volumes to consider information that is not found in its designated file. Consequently, PTP has

---

[4] Furthermore, as the United States aptly observes, "even if the technical and past performance decisions must necessarily turn out the same way, [PTP's] past performance proposal may have actually been over-rated, rather than its technical proposal being under-rated." (Def.'s Reply at 10 n.7, ECF No. 21).

9

failed to show, by a preponderance of the evidence, that the Agency's contemporaneous evaluation was arbitrary, capricious, or otherwise not in accordance with law.

### B. The Agency's Statements During Debriefing and at GAO

PTP next alleges that the Agency admitted, during debriefing and at the GAO proceedings, that its contemporaneous rationale for rating PTP technically unacceptable was flawed, requiring remand. (Compl. at 24; Pl.'s Mem. at 1–3, 15–17). Specifically, PTP claims that during debriefing, the Agency admitted it "underst[ood] the acronyms listed in PTP's proposal," thereby conceding that its contemporaneous evaluation was flawed. (Pl.'s Mem. at 2, 12, 15–17 (quoting AR 10038)). PTP further notes that in the "Consolidated Contracting Officer's Statement of Facts and Memorandum of Law" submitted during the later-abandoned GAO proceedings, the Agency stated that PTP's proposal Table 1.1-2, "indicate[s] the SOW area covered, organization supported, and the teammates that provided support." (Pl.'s Mem. at 2–3, 12–14, 15–17 (quoting AR 10688)). PTP also claims that during the GAO proceedings, the Agency admitted PTP's proposal shows [* * *]—one of the three [* * *] stated in the Solicitation. (Pl.'s Mem. at 2, 16 (citing AR 10689–90)). According to PTP, the Agency's statements during the GAO proceeding constitute both *post hoc* rationalizations that should not be accepted and an acknowledgement that the Agency's contemporaneous rationale for PTP's rating was erroneous. (Pl.'s Mem. at 15–17; Pl.'s Reply at 4–13). PTP reconciles these two, seemingly conflicting positions, by characterizing agency protest filings as argument, rather than evidence, and maintains that these filings are "relevant for the purpose of establishing what was argued before GAO" but "can neither fill in gaps in the agency's reasoning for award nor supply missing documentation of that reasoning." (Pl.'s Reply at 4–13 (quoting *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 377–78 (2010) and *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 343–44 (1997), among other cases)).

The statements cited by PTP do not contradict the Agency's contemporaneous rationale. The Agency's contemporaneous rationale explained that [* * *] (AR 8956–57). Whether or not the Agency understood the acronyms in PTP's tables does not obviate the fact that PTP did not provide a reference for the acronyms it used, did not provide a [* * *] (*see* AR 558 (inviting offerors to "submit, as a standalone document marked 'Cross-Reference', a comprehensive glossary, compliance matrix and acronym list"), AR 565 (explaining that offerors that are able to describe how they meet the SOW requirements would be viewed as satisfying the three mission Imperatives), AR 559 (instructing that "Volume II must provide specifics and be complete.")).

Likewise, the statements in the "Consolidated Contracting Officer's Statement of Facts and Memorandum of Law" at the GAO do not contradict the Agency's contemporaneous rationale. In explaining that [* * *] (AR 10688). This simply recites the headings and content of PTP's Table 1.1-2, which is provided immediately above this statement. (*See* AR 10688). The Agency then explains that [* * *] (AR 10688) (emphasis in original).

These statements align with the Agency's contemporaneous rationale, which stated [* * *] and that [* * *] (AR 8956–57). To the extent there is tension between the agency report stating PTP's tables [* * *] this does not establish that the Agency's evaluation lacked a rational basis. *See Impresa*, 238 F.3d at 1332–33 ("the disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'"); *Info. Tech. & Applics. Corp.*, 51 Fed.

Cl. at 346 ("[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law.")).

Furthermore, even accepting PTP's contention that the Agency conceded PTP's proposal shows redundancy, this does not show that "the agency 'entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Ala. Aircraft Indus.*, 586 F.3d at 1375. To the extent PTP alleges that the Agency's GAO filing "offers new criticisms of PTP's proposal that cannot be traced back to the SSEB Report," (Pl.'s Reply at 3), the Court agrees that such arguments cannot "fill in gaps in the agency's reasoning for an award or supply missing documentation of that reasoning." *CRAssociates*, 95 Fed. Cl. at 377–78. However, there is no occasion to consider such statements because the Agency's contemporaneous rationale provided a coherent and reasonable explanation of its exercise of discretion. *Impresa*, 238 F.3d at 1332–33.

C. *Alleged Unequal Treatment*

Next, PTP argues that the Agency "held PTP to a higher standard than several awardees." (Pl.'s Mem. at 4–5, 28–36).[5] The Court disagrees.

Contracting officers have a duty to "ensure that contractors receive impartial, fair, and equitable treatment." 48 C.F.R. § 1.602-2. The Federal Circuit recently explained that "[t]his obligation necessarily encompasses an agency's obligation to fairly and impartially evaluate all proposals. Equal evaluation of proposals, however, does not translate into identical evaluations." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). "An agency is under no obligation to assign dissimilar proposals the same evaluation rating." *Id.* (citing 48 C.F.R. § 1.102-2(c)(3)). To prevail, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Id.* (citations omitted). "A protestor may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Id.* The Federal Circuit cautioned, however, that it is not the role of the court "to second-guess the agency's discretionary determinations underlying its technical ratings." *Id.* (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

PTP focuses predominantly on the awardees' use of "acronym-heavy capabilities tables to demonstrate how their experience maps across the SOW requirements." (*See* Pl.'s Mem. at 28–33). According to PTP, the proposals of awardees [* * *] all "rely on tables with acronyms to demonstrate their capabilities across the SOW . . . [and] similarly omit discussion of specific SOW requirements outside their capabilities table . . . without evaluative consequence." (*Id.* at 4–5, 28). PTP further alleges that these awardees "like PTP, cited both [* * *] internal training experiences to demonstrate their capabilities." (*Id.* at 28, 33–36). These arguments fail to establish that USSOCOM unreasonably downgraded PTP's proposal for deficiencies that were

---

[5] The SSEB training materials explained that the training explained that "SSEB evaluates proposals against evaluation criteria NOT proposals against one another; [the Source Selection Advisory Council ("SSAC")] (or [Source Selection Authority ("SSA")]) conducts the comparative analysis." (AR 4083) (emphasis in original).

11

"substantively indistinguishable" or nearly identical from those contained in other proposals. *See Office Design Grp.*, 951 F.3d at 1372.

In focusing on the awardees' use of acronyms, PTP misconstrues the Agency's evaluation of its proposal. The Agency did not rate PTP's proposal as unacceptable because it used acronyms. (*See* AR 8956–57). Instead, the Agency stated that [* * *] explaining that most of the Capabilities portion of PTP's proposal [* * *] (AR 8956–57).

Turning to PTP's specific challenges, PTP cites to a single table in [* * *] proposal, "which uses 'X' markers to indicate which contracts its team has performed that align with the representational SOW tasks" and contains acronyms. (*See* Pl.'s Mem. at 30). However, when viewed in the context of the rest of the Capabilities portion of [* * *] proposal, it is clear that the deficiencies cited by USSOCOM with regard to PTP's proposal are not found in [* * *] proposal. (*See* AR 1537–46). Whereas USSOCOM faulted PTP's proposal for consisting of mainly [* * *]," [* * *] proposal consists largely of explanations of how it meets the Capabilities requirements. (*See* AR 1537–46). It cannot be said that the Capabilities portion of [* * *] proposal was [* * *] (*Compare* AR 2381–89 *with* AR 1537–46). "An agency is under no obligation to assign dissimilar proposals the same evaluation rating." 48 C.F.R. § 1.102-2(c)(3); *Office Design Grp.*, 951 F.3d at 1372.

With respect to [* * *], PTP again focuses on a single table in the Capabilities portion of [* * *] proposal, noting that the table contains acronyms. (*See* Pl.'s Mem. at 31–32 (citing AR 1325)). According to PTP, "[t]he SSEB . . . did not criticize [* * *] use of a table or discuss [* * *] tables at all in the evaluation." (Pl.'s Mem. at 31). However, a review of the whole of the Capabilities portion of [* * *] proposal reveals that this section, like [* * *] proposal, consists largely of explanations of how it meets the Capabilities requirements rather than consisting mainly of "tables filled with acronyms." (*See* AR 1324–28). Moreover, although [* * *} proposal contains acronyms, [* * *] provided a cross-reference document that contained an acronym list, as the Solicitation invited. (*See* AR 1180–83; *see also* AR 558 (inviting offerors to "submit, as a standalone document marked 'Cross-Reference', a comprehensive glossary, compliance matrix and acronym list.")). "An agency is under no obligation to assign dissimilar proposals the same evaluation rating." 48 C.F.R. § 1.102-2(c)(3); *Office Design Grp.*, 951 F.3d at 1372.

With respect to [* * *], PTP once again focuses on a single table from the Capabilities portion of the proposal, which contains acronyms. (Pl.'s Mem. at 32–33 (citing AR 3752)). As with [* * *], a review of the entire Capabilities portion of [* * *] proposal reveals that this section consists largely of explanations of how it meets the Capabilities requirements rather than consisting mainly of "tables filled with acronyms." (*See* AR 3748–54). Furthermore, like [* * *] provided a cross-reference document that contained an acronym list, as the Solicitation invited. (*See* AR 3686–90). "An agency is under no obligation to assign dissimilar proposals the same evaluation rating." 48 C.F.R. § 1.102-2(c)(3); *Office Design Grp.*, 951 F.3d at 1372.

In addition, PTP argues that [* * *] failed to provide a narrative discussion of certain representative tasks identified in the Solicitation. (*See* Pl.'s Mem. at 30–33). Again, PTP misses the mark. The Agency did not fault PTP for failing to discuss every representative task, rather it found PTP's proposal unacceptable because PTP provided [* * *] (AR 8957). Quite simply, the deficiencies that the Agency found in PTP's proposal are not present in the [* * *} proposals.

"An agency is under no obligation to assign dissimilar proposals the same evaluation rating." 48 C.F.R. § 1.102-2(c)(3); *Office Design Grp.*, 951 F.3d at 1372.

Finally, PTP again attacks the Agency's statements during the GAO proceedings, arguing that the Agency faulted PTP for citing [* * *] experience while [* * *] did not receive the same criticisms despite also citing [* * *] experience. (Pl.'s Mem. at 33–36). However, as PTP acknowledges repeatedly throughout its briefs, "agency decisions must stand or fall based on 'the grounds that the agency invoked when it took the action.'" (Pl.'s Mem. at 3, 17 (quoting *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020)); *see also* Pl.'s Mem. at 15, 16; Pl.'s Reply at 2, 3, 5–15). The SSEB's evaluation report does not fault PTP for citing [* * *] experience. (*See* AR 8956–57). Thus, PTP's arguments in this regard are without merit.

In sum, PTP has failed to show that "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Office Design Grp.*, 951 F.3d at 1372. Consequently, PTP has not demonstrated that it was subjected to unequal treatment.

### D. Best Value Determination

PTP's final challenge alleges that the Agency conducted a flawed best value determination "[b]ecause the source selection decision rests on an arbitrary and capricious SSEB finding that PTP is Unacceptable under Factor 1." (Pl.'s Mem. at 36). PTP's entire argument in this regard rests on the premise that the Agency's evaluation of PTP was arbitrary or capricious. (*See* Pl.'s Reply at 24). However, as explained above, the Court concludes that the Agency's source selection decision as to PTP was not arbitrary or capricious. Therefore, PTP has failed to demonstrate that the Agency conducted a flawed best value determination.

### E. Injunctive Relief

An "injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To obtain permanent injunctive relief, a party must establish: (1) success on the merits; (2) irreparable harm if an injunction does not issue; (3) the balance of harm favors the movant; and (4) that the injunction serves the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Amazon Web Servs., Inc. v. Unites States*, 147 Fed. Cl. 146, 153 (2020). Although "[n]o one factor, taken individually, is necessarily dispositive . . . , the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

In this case, PTP has failed to establish success on the merits for the reasons set forth above. With regard to the second factor, PTP alleges it "will suffer the irreparable harm of being deprived of the opportunity to compete fairly for a contract." (Pl.'s Mem. at 37). However, as explained above, PTP has not been deprived of the opportunity to compete fairly for a contract. While there is no need to go any further in this analysis, the balance of harm and public interest

13

likewise weighs in favor of the United States. Therefore, PTP's request for a permanent injunction is **DENIED**.

    F. *PTP's Motion to Strike*

The only matter remaining is PTP's motion to strike, (ECF No. 22), directed to a declaration of the Contracting Officer that the United States appended to its Reply brief. (*See* ECF No. 21, Ex. A). This declaration was taken on November 12, 2020, well after this protest was filed, and states that the Contracting Officer reviewed PTP's entire proposal in the course of its evaluation. (*See id.* at 2–3). PTP moved to strike this exhibit on grounds that "[t]he declaration is an improper and unnecessary attempt to supplement the administrative record." (Pl.'s Mot. to Strike at 1). In response, the United States argues "there is nothing in the Rules of this Court that requires the filing of a motion to supplement or motion for leave prior to filing a declaration to support a motion for judgment on the administrative record," and the declaration is timely because it responds to an argument that PTP raised for the first time in its Reply brief. (Def.'s Resp. to Pl.'s Mot. to Strike at 2–3, ECF No. 24). However, in light of the Court's holdings above, this issue is moot.

### III.    Conclusion

For the reasons set forth above, the Court **DENIES** PTP's Motion for Judgment on the Administrative Record, (ECF No. 18), **DENIES** PTP's request for a preliminary injunction, and **GRANTS** the United States' Cross-Motion for Judgment on the Administrative Record, (ECF No. 19). In addition, the Court **DENIES-AS-MOOT** PTP's Motion to Strike, (ECF No. 22). The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

The parties are directed to file proposed redactions to this opinion within 14 days of the date of this decision.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge